UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 1:15 mj 03057 Torres -3 CBR

UNITED STATES OF AMERICA

vs.

CHRISTOPHER RENNIE GLENN,

       **Defendant.**
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003?  _____ Yes  ___✓___ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007?  _____ Yes  ___✓___ No

        Respectfully submitted,

        WIFREDO A. FERRER
        UNITED STATES ATTORNEY

BY: _____
        Olivia S. Choe
        Assistant United States Attorney
        Court No. A5501503
        99 N.E. 4th St., Miami, FL 33132
        (305) 961-9437 (telephone)
        (305) 536-4676 (facsimile)
        Olivia.S.Choe@usdoj.gov

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Christopher Rennie Glenn<br><br>*Defendant(s)* | )<br>)<br>)  Case No.  1:15mj 03037Torres-3CBR<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___May 19, 2012___ in the county of ___Miami-Dade___ in the ___Southern___ District of ___Florida, and elsewhere___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 2423(b) | Christopher Rennie Glenn, a United States citizen, traveled in foreign commerce, that is, from Miami International Airport, in Miami, Florida, to Honduras, for the purpose of engaging in any illicit sexual conduct, as defined in Titile 18, United States Code, Section 2423(f), with Victim A, a person under 18 years of age. |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

*Complainant's signature*

FBI Special Agent Alexis Carpinteri
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___08/03/2015___

*Judge's signature*

City and state: ___Miami, Florida___      Magistrate Judge Edwin G. Torres
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

Your affiant is Alexis Carpinteri, Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), who, first being duly sworn, deposes and states as follows:

### INTRODUCTION

1.      I am an investigative or law enforcement officer of the United States within the meaning of § 2510(7) of Title 18, United States Code.  That is, I am an officer of the United States, who is empowered by law to conduct investigations of and make arrests for, offenses enumerated in Title 18, United States Code, §§ 2422, 2423, 2251 and 2252, et seq.

2.      I am a Special Agent with the FBI, having been so since January 1997.  Currently, I am assigned to the investigation of cases involving crimes against children.  These investigations have included the utilization of surveillance techniques, undercover activities, the interviewing of subjects and witnesses, and the planning and execution of search, arrest and seizure warrants.

3.      I am conducting an investigation involving the sexual exploitation of children and related activities of the individual named herein.  I have personally participated in the investigation of the offenses referred to herein, and because of my personal participation in this investigation and reports made to me by members of the participating law enforcement agencies; I am familiar with the facts and circumstances of this investigation. I have participated in investigations involving pedophiles, preferential child molesters, and persons who collect and/or distribute child pornography, along with the importation and distribution of materials relating to the sexual exploitation of children.  I have received training in the area of child pornography and child exploitation through the FBI.  I also have assisted in several child pornography and child exploitation investigations, which have involved reviewing examples in all forms of media

including computer media, and have discussed and reviewed these materials with other law enforcement officers. As an FBI agent, I have reviewed thousands of images and videos of child pornography.

4. Although I am familiar with the full breadth of the facts and circumstances of this investigation, I have not included in the Affidavit each and every fact known to me about the matters set forth herein, but only those facts and circumstances that I believe are sufficient to establish probable cause for the Court to authorize a criminal complaint.

5. The statements contained in this Affidavit are based upon my investigation, information provided by other sworn law enforcement officers and other personnel specially trained in the seizure and analysis of computers and electronic media, and on my experience and training as a federal agent.

## RELEVANT STATUTES

6. This affidavit is made in support of a criminal complaint charging **CHRISTOPHER RENNIE GLENN**, a/k/a **"Yusif," "Derek John Michael," "Fernando Albergue,"** and **"El Gringo,"** with violating the following criminal statute: 18 U.S.C. § 2423(b) – being a United States citizen, traveling in foreign commerce for the purpose of engaging in illicit sexual conduct with another person.[1] Pursuant to 18 U.S.C. § 2423(f), the term "illicit sexual conduct" here means either (1) a sexual act (as defined in 18 U.S.C. § 2246) with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States; or (2) any commercial sex act (as defined in 18 U.S.C. § 1591) with a person under 18 years of age. A "sexual act" is defined

---

[1] The definitions for the statutes cited to herein refer to the statutory language in effect during the relevant time periods.

2

in 18 U.S.C. § 2246 and includes contact between the penis and the vulva or the penis and the anus involving penetration, however slight; or contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus; or the penetration, however slight, of another person's anal or genital opening by a hand, finger or any object with an intent to abuse, humiliate, harass or degrade the person or arouse or gratify the sexual desires of the defendant or any other person; or the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.[2]  It is a violation of chapter 109A to knowingly "render[] another person unconscious and thereby engage[] in a sexual act with that other person," or "administer[] to another person … without the knowledge or permission of that person, a drug, intoxicant, or other similar substance and thereby – (A) substantially impair[] the ability of that other person to appraise or control conduct; and (B) engage[] in a sexual act with that other person." 18 U.S.C. § 2241(b)(1), (2). A "commercial sex act" is defined in 18 U.S.C. § 1591(e)(3) as any sex act, on account of which anything of value is given to or received by any person.

## BACKGROUND

7. Between February and August 2012, GLENN, a United States citizen, was a civilian contractor working as a network system administrator for Harris Corporation at the U.S. Army Southern Command's Joint Task Force Bravo ("JTF-B"), in Soto Cano Air Base, Honduras. Law enforcement began investigating GLENN after the Department of Defense

---

[2] "The Government does not have to prove that the Defendant actually engaged in a sexual act with a person under 18 years of age, but must prove that he traveled with the intent to engage in such conduct. Proof of the Defendant's intent may be established by either direct or circumstantial evidence." United States v. Carter, 776 F.3d 1309 (11th Cir. 2015).

3

("DoD") learned that GLENN had stolen, copied, and transferred DoD classified documents and electronic messages ("emails") without authorization, and had then attempted to mislead DoD investigators and employees about his conduct. Following a lengthy investigation into such conduct, GLENN was indicted by a federal grand jury in the Southern District of Florida on February 18, 2014 (Case No. 9:14-cr-80031-KAM(s)).

8.   While federal authorities in the United States were investigating GLENN for these offenses, law enforcement authorities in Honduras discovered evidence indicating that GLENN was involved with exploiting children in Honduras. Based on information received from the Honduran authorities, in or around February 2014, the United States Attorney's Office for the Southern District of Florida ("USAO") commenced a federal grand jury investigation in Miami into GLENN's alleged child exploitation activities in Honduras.

9.   As discussed in further detail below, further investigation into GLENN's conduct revealed that, over the course of several years, GLENN had been traveling to Honduras from the United States and elsewhere, locating young females living in remote, poor villages in Honduras, and convincing the young females' families to allow them to work as housekeepers for GLENN. Once the young females were at GLENN's residence, GLENN would engage in sexual acts with them.

4

## PROBABLE CAUSE

### *Travel with Intent to Engage in Illicit Sexual Conduct*

10. In May of 2014, your Affiant interviewed VICTIM A, a Honduran national, and she provided details regarding her interactions with GLENN. Of note, records obtained from Honduras show that VICTIM A was born in 1995. In the spring of 2012, VICTIM A was 16 years of age.

11. VICTIM A stated that in March or April of 2012, a Honduran male (later identified, and hereinafter referred to, as "J.A."), who was acquainted with VICTIM A's parents, came to VICTIM A's home to ask her parents if she could work as a housekeeper. VICTIM A lived in a poor village, in a wooden shack with no electricity, plumbing, or running water. Her mother was told that the job was in Lago de Yojoa. For VICTIM A, the job paid a significant amount of money. VICTIM A's mother allowed her to take the job, and VICTIM A left her home with J.A. When they entered the truck, a man named "Yusef," later identified by VICTIM A as GLENN, was inside of the truck.

12. VICTIM A was taken to J.A.'s house in Comayagua, not to Lago de Yojoa. Comayagua is several hours away from VICTIM A's home. GLENN was residing in J.A.'s house at the time (but was in the process of building his own house adjacent to J.A.'s house). Upon her arrival to J.A.'s home, VICTIM A began doing chores for J.A. and his family. A few days later, J.A. told VICTIM A that he had spoken to VICTIM A's father, and that her father had consented to VICTIM A marrying GLENN. VICTIM A asked if she could call her father, but she was not allowed to. VICTIM A did not have a phone of her own to use.

13. VICTIM A stated that a "marriage ceremony" took place immediately and that J.A. performed the "marriage ceremony." GLENN came into the room and J.A. read from a

5

piece of paper in a language she did not understand (but which she later learned was Arabic). Soon thereafter, VICTIM A was presented with a paper to sign. VICTIM A cannot read or write. Of note, GLENN is fluent in English, Spanish, and Arabic.

14. After the "marriage ceremony," GLENN told VICTIM A to wear a long skirt and top, and to cover her head with a scarf. VICTIM A was then given "vitamins" to calm her nerves. After taking the pills, VICTIM A became very dizzy, sleepy and had a headache. Shortly thereafter, she blacked out.

15. The next thing VICTIM A remembered was waking up, the next day, in "that" bed, which she further described as GLENN's bed in GLENN's bedroom. She woke up alone in the bed and was wearing the same clothing that she had been wearing the day before. She was confused and disoriented. Although she could not remember anything from the night before, she thought that she may have had sex with GLENN.

16. After the "marriage ceremony," VICTIM A continued to reside with GLENN at J.A.'s home. VICTIM A said that GLENN was nice to her and provided her with a home, food and ice cream. She no longer wanted for anything – GLENN provided her with everything. VICTIM A first recalled sexual relations with GLENN taking place on the second night of their marriage. She stated that sometimes she was fine having sex with GLENN, and other times she did not want to. VICTIM A stated that she always complied though because she thought that the marriage ceremony was real and that she had a duty to have sex with GLENN now. She also stated that after she had sex with him, GLENN would treat her well.

17. Over time, VICTIM A stated that she developed feelings for GLENN and believed that she loved him. Notably, VICTIM A resided with GLENN in Comayagua for nearly one year.

6

18. GLENN gave VICTIM A pills often during their time together. VICTIM A believed that the pills were birth control. After taking the pills, she would feel sleepy and dizzy. She could not recall details after having taken the pills, but believed that she and GLENN would have sex during these times. After a while, GLENN gave her injections, which she also thought was for birth control.

19. Approximately sometime between April and June of 2012, while VICTIM A was residing with GLENN in Comayagua, she accompanied GLENN and J.A., at their request, to a poor countryside area, several hours away from Comayagua, because GLENN and J.A. wanted to find another young girl to "work" for GLENN. VICTIM A stated that they first approached a family who agreed to send their 20-year-old daughter to work for GLENN. However, J.A. and GLENN declined to hire the girl because they said she was too old. A second family they approached declined their offer. GLENN and J.A. then approached another family, who had a 14-year-old daughter, hereinafter referred to as "VICTIM B." VICTIM B lived with her family in a small hut in a poor hillside village. J.A. and GLENN saw VICTIM B as she was walking with a stack of wood, and then approached her family.

20. Records obtained from Honduras show that VICTIM B was born in 1998. In the summer of 2012, VICTIM B was 14 years of age.

21. VICTIM A was introduced to VICTIM B as J.A.'s niece (instead of GLENN's wife). J.A. represented to VICTIM B's mother that VICTIM B would be taking care of J.A.'s sick mother. VICTIM B was interviewed by law enforcement and recalled that J.A. told her family that she would be paid a significant amount in lempiras (Honduran currency) monthly. It was agreed that VICTIM B would take the job and she was taken back to J.A.'s residence in Comayagua.

7

22. Shortly after they returned to Comayagua, J.A. got on his cell phone and appeared to be making a call, allegedly to VICTIM B's family. VICTIMS A and B heard J.A. on the phone proposing that VICTIM B marry GLENN. According to VICTIM A, VICTIM B seemed very confused and told J.A. that she wanted to talk to her mother. VICTIM B tried to take the phone from J.A. but was unable to do so. J.A. told VICTIM B that her family had agreed to the marriage proposal, and then hung up the phone. After the phone call, VICTIM B was given two pills to take.

23. J.A. then performed a "marriage ceremony" between GLENN and VICTIM B. The "marriage ceremony" between VICTIM B and GLENN was in Arabic. At the end of the "marriage ceremony," it was explained to VICTIM B that she was now GLENN's wife. She immediately burst into tears. VICTIM B became dizzy and GLENN took her to the bedroom. GLENN told VICTIM A not to come into the bedroom.

24. The next day, VICTIM B could not recall anything that had happened to her after the ceremony when she became dizzy. She did recall that when she woke up that morning, she was naked in GLENN's bedroom, and that GLENN was in his underwear. VICTIM B was very sad and cried all day. According to VICTIM A, J.A. and GLENN decided to take VICTIM B back to her home because she was crying too much.

25. VICTIM A lived with GLENN until mid-2013, and stated that when GLENN was not traveling, they had sex on a daily basis. VICTIM A stated that GLENN promised to pay her family thousands of Honduran lempiras after her marriage to him, and that he did in fact give her family a significant amount of money. She stated that the money was used for her family to build a home extension, and obtain electricity and plumbing. Indeed, between 2012 and 2014 significant home improvements were made to VICTIM A's home. Further, VICTIM A's parents

8

corroborated that GLENN gave them money for such home improvements. In addition to money, VICTIM A stated that GLENN gave her family, at times, food and other provisions.

### *Evidence Corroborating Victims' Statements*

26. On or about March 11, 2014, Honduran police executed a judicially authorized warrant to search a house and compound that GLENN maintained in Comayagua, Honduras, near Soto Cano Air Base, in order to search for evidence of child exploitation.

27. Among other evidentiary items, the Honduran authorities found several pill containers in GLENN's residence. The Drug Enforcement Agency ("DEA") in Miami, Florida tested a sampling of the pills and determined that some of the pills were promethazine and clonazepam. These drugs can be used as sedatives.

28. In addition, the Honduran police search of GLENN's residence in Honduras revealed that he maintained computers, servers, removable media, and other electronic equipment. Honduran authorities later allowed FBI and U.S. government computer forensic experts to make duplicate images of the electronic evidence seized.

29. On June 16, 2014, a federal search warrant was signed by the Honorable Magistrate Judge Garber, Southern District of Florida, for the forensic examination of the duplicate images of the electronic evidence related to the federal child exploitation investigation. Pursuant to the search warrant, FBI computer forensic examiners and agents located child pornography and child erotica files on a Synology NAS 411 slim unit (the "Synology"). Specifically, videos and images of minor females were found. Some of the content was sexually explicit in nature and some was not. The following is a description of only some of the videos and images of VICTIM A that were recovered:

  a. In a series of images, VICTIM A was observed standing in a hotel room. Some of the images contained furniture, curtains and the pool. The images appear to have been taken at the InterContinental Hotel in Tegucigalpa, Honduras. The date associated with these images is on or about May 6, 2012.

  b. In a series of four (4) videos, VICTIM A was observed taking a bath in a hotel room in Honduras. She was naked and in a bathtub. Further, other videos and photographs taken on or around the same date as that video indicate that GLENN had possession, control, and use of the camera. The date associated with these videos is on or about May 27, 2012.

30. A series of photographs, titled "Dinero de Casa" (English translation: "Money for House"), was found on the Synology and depict a yellow manila envelope (open) containing bundles of Honduran lempiras. Depicted on the outside of the envelope is the following writing: "(USD $10,416.00) (L $200,000)." Beneath that writing are the words "Christopher Glenn," followed by GLENN's verified social security number and the date "30/March/2012." Immediately following this series of photographs are photographs of VICTIM A's residence, which show VICTIM A's home prior to a home extension, plumbing, and electricity. The date associated with both photographic series is on or about April 15, 2012.

### *Evidence Obtained Regarding GLENN's Travel and Citizenship Status*

31. Spirit Airlines records revealed that GLENN traveled on Spirit Airlines Flight 826 from San Pedro Sula, Honduras to Fort Lauderdale, Florida, on March 3, 2012. GLENN returned from Fort Lauderdale, Florida to San Pedro Sula, Honduras on March 6, 2012 aboard Spirit Airlines Flight 829.

32. American Airlines records revealed that GLENN traveled on American Airlines Flight 954 from Tegucigalpa, Honduras to Miami, Florida on May 12, 2012. GLENN returned from Miami, Florida to Tegucigalpa, Honduras on May 19, 2012 aboard American Airlines Flight 953.

33. Hotel records from the InterContinental Hotel Group also confirmed that GLENN was in both Honduras and South Florida in May of 2012. Specifically, the records showed the following details regarding his stay at the InterContinental Hotel located in Tegucigalpa, Honduras:

   a. GLENN checked into the hotel on May 5, 2012 for a one (1) night stay. GLENN checked out of the hotel on May 6, 2012.

   b. GLENN checked into the hotel on May 26, 2012 for a two (2) night stay. GLENN checked out of the hotel on May 28, 2012.

34. The records further showed that GLENN stayed at the InterContinental Hotel in Doral, Florida (Miami-Dade County) for seven (7) nights beginning on May 12, 2012. GLENN checked out of the hotel on May 19, 2012.

35. A Certificate of Live Birth for GLENN confirmed that GLENN was born in Amherst, New York in 1980.

## CONCLUSION

36.    Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that CHRISTOPHER RENNIE GLENN, a United States citizen, traveled in foreign commerce, that is, from Miami International Airport to Honduras, for the purpose of engaging in illicit sexual conduct with a person under the age of 18 years, in violation of 18 U.S.C. § 2423(b).

Alexis Carpinteri, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on this 3rd day of August, 2015, in Miami, Florida:

HONORABLE EDWIN G. TORRES
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF FLORIDA